UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                              CASE. NO. 22-20389

      Plaintiff,

v.                               HON. MARK A. GOLDSMITH

DEMETRIUS PATTERSON,

      Defendant.

_____/

## DEMETRIUS PATTERSON'S SENTENCING MEMORANDUM

Demetrius Patterson is set for sentencing on his supervised release violation petition, set for March 18, 2025, where he has already pleaded guilty to violations 1 through 6. Despite guidelines of 21-24 months, Patterson respectfully requests that this Court sentence Mr. Patterson to time served, and to reimpose supervised release for a period of no longer than five years.

### A. The Question

In considering the proper sentence for Patterson, the Court may be wondering "How serious was the violation committed or breach of trust?" or "What is the just punishment for this offense?" But undersigned counsel submits that the proper question for consideration is this: "Will a sentence of incarceration facilitate Patterson's transition back into the community?"

1

To understand why that question is the proper one, the Court should look to 18 U.S.C. § 3583 and the legislative history of supervised release. 18 U.S.C. § 3583 governs supervised release and what the court should consider in imposing a sentence. 18 U.S.C. §§ 3583(c), in particular, directs the court to consider the factors set forth in sections §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7). Those are factors such as the "nature and circumstances of the offense," "the history and characteristics of the defendant," deterrence, public safety, and rehabilitation.

Strikingly, the statute does not ask the Court to consider §§ 3553(a)(2)(A); that is, there is no needing to consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

Why would Congress not direct the courts to consider "just punishment" or the "seriousness of the offense?" The answer lies in the legislative history of 18 U.S.C. § 3583. The legislative history indicates that §§ 3553(a)(2)(A) was not included for consideration under 18 U.S.C. § 3583(c) because the primary purpose of supervised release is to facilitate the integration of offenders back into the community rather than to punish them.[1] Just as with federal parole, "Congress intended supervised release to

---

[1] *See* S. Rep. No. 98-225 at 124 (1983) (explaining that the goal of supervised release is "to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release").

2

assist individuals in their transition to community life"; therefore, "supervised release fulfills rehabilitative ends, distinct from those served by incarceration."[2] Like federal probationers, offenders on supervised release are subject to the jurisdiction of federal courts, are monitored by federal probation officers, and they also are typically subject to the same types of conditions.[3] But "[s]upervised release, in contrast to probation, is not a punishment in lieu of incarceration"[4] and, moreover, supervised release is primarily concerned with "'facilitat[ing] the reintegration of the defendant into the community.'"[5]

---

[2] *United States v. Johnson*, 529 U.S. 53, 59 (2000).

[3] Indeed, the authorized conditions for supervised release are generally the same ones as probation. See 18 U.S.C. §§ 3563(b), 3583(d).

[4] *United States v. Granderson*, 511 U.S. 39, 50 (1994).

[5] *United States v. Vallejo*, 69 F.3d 992, 994 (9th Cir. 1995) (quoting USSG §5D1.1 comment. (n.2) (Nov. 1992)). "[T]he basic purpose of probation [is] . . . to provide an individualized program offering a young or unhardened offender an opportunity to rehabilitate himself without institutional confinement under the tutelage of a probation official and under the continuing power of the court to impose institutional punishment for his original offense in the event that he abuses this opportunity." *Roberts v. United States*, 320 U.S. 264, 272 (1943). The primary purpose of supervised release — to facilitate the reintegration of federal prisoners back into the community — is similar to the purpose of the Second Chance Act of 2007 (Pub. L. No. 110–199), which was intended to "reduce recidivism, increase public safety, and help state and local governments better address the growing population of ex-offenders returning to their communities." H.R. Rep. No.110–140 (2007). The Second Chance Act focuses on "development and support of programs that provide alternatives to incarceration, expansion of the availability of substance abuse treatment, strengthening families of ex-offenders, and the expansion of comprehensive re-entry services." *Id*. "The goal of [the prison re-entry] initiative is to help America's prisoners by expanding job training and placement services, improving their ability to find transitional housing, and helping newly released prisoners get mentoring, including from faith-based groups." Pub. L.

The United States Sentencing Commission, recognizing this goal of reintegration, has recently proposed meaningful amendments to Chapters 5 and 7 of the Guidelines Manual concerning supervised release. In particular, they proposed amendments to the introductions of Chapters 5 and 7, reminding the courts to consider the primary purpose of reintegration. The proposed introduction to Chapter 5 will now affirm that "Supervised release 'fulfills rehabilitative ends, distinct from those served by incarceration," *United States v. Johnson,* 529 U.S. 53, 59 (2000)." 2025 Proposed Amendments to the Sentencing Guidelines, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20250130_rf-proposed.pdf. The proposed introductory commentary to Chapter 7 goes much farther, stating:

> Because supervised release is intended to promote rehabilitation and ease the defendant's transition back into the community, the Commission encourages courts—where possible—to consider a wide array of options to respond to non-compliant behavior and violations of the conditions of supervised release. These interim steps before revocation are intended to allow courts to address the defendant's failure to comply with court-imposed conditions and to better address the needs of the defendant while also maintaining public safety. If revocation is mandated by statute or the court otherwise determines revocation to be necessary, the sentence

---

No. 110–199, Statement by President George W. Bush Upon Signing, as reprinted in, 2008 U.S.C.C.A.N. S10. "In this Act, the Congress has directed a shift from policing those on parole to rehabilitating them. The parole system now bears an increasing special obligation to help . . . offenders successfully reenter into society. . . . It is clear that the spirit of the Second Chance Act of 2007 intends that the entire penal systems, state and federal, work towards the rehabilitation of prisoners for the purpose of reducing recidivism. " *United States v. Wessels*, 539 F.3d 913, 915 (8th Cir. 2008) (Bright, J. concurring)

> imposed upon revocation should be tailored to address the failure to abide by the conditions of the court-ordered supervision; imposition of an appropriate punishment for new criminal conduct is not the primary goal of a revocation sentence. The determination of the appropriate sentence on any new criminal conviction that is also a basis of the violation should be a separate determination for the court having jurisdiction over such conviction.

*Id.*

A public hearing on these proposed amendments is set to take place on March 12 and 13th of this year. The Federal Public and Community Defender community supports the amendments. Regardless of whether or not the Sentencing Commission ultimately adopts the proposed amendments, the mere consideration of such amendments shows a desire by the Sentencing Commission to reform the punitive way we often treat supervised release violations. There is growing support for recentering supervised release on its original purpose, which is to reintegrate and rehabilitate.

**B. The Answer**

With that framework in mind, we look to the Guidelines Manual, which calls for a guideline range of 21-24 months. That range is driven by a Grade B violation, Violation #2, where Patterson is alleged to have relapsed on cocaine back in February of 2023. Will a 21-24-month sentence (or any incarceration sentence, for that matter) help facilitate Patterson's integration back into the community? The answer is no.

Looking at the nature of the violation, there is not enough to justify a 21-month sentence. Patterson struggles with substance abuse disorder, in part a reflection of his upbringing. He grew up in poverty in Mobile, Alabama, the oldest of thirteen children,

5

with eight brothers and four sisters. One of his younger sisters was killed in a car accident in 2013. Mr. Patterson is very close with all his siblings, and his sister, Jawanna Patterson is his biggest support person.

Mr. Patterson's biological father, Mannie Moffett, passed away when he was a baby. His mother, Julia Patterson, remarried Charles Dunkin, who was the primary father-figure in Mr. Patterson's life. His mother worked hard to put food on the table, but Charles had a drug problem, so many of his mother's efforts to care and provide for the family were spoiled by Charles' drug-fueled behaviors.

Mr. Patterson and his siblings grew up in the Josephine Allen Housing Projects, better known as "Happy Hills," a part of Africatown just outside of Mobile, Alabama. Africatown was formed by a group of 32 West Africans, who, in 1860, were bought and transported against their will in the last known illegal shipment of slaves to the United States.[6] During the mid-1960s the new housing project, Happy Hills, was established alongside two others, Kelly Hills and Clay Hills. Happy Hills was considered the melting pot of sorts for the area, having attracted people from both Mobile and Prichard, two cities with different history. From the very start, Happy Hills was a volatile place, gaining its nickname of "Little Vietnam," due to constant fighting among residents of the housing project.

---

[6] For more information, see Sylviane A. Diouf, *Africatown,* available at https://encyclopediaofalabama.org/article/africatown/ (Last accessed on March 12, 2025)

As years went by, the animosity and tension among residents grew. By the time Mr. Patterson and his family settled there, drugs, shootings, and robbery were a daily occurrence. The Josephine Allen projects were among the worst and most violent in all Mobile, Alabama.

For no good reason and while he was walking around his neighborhood in Happy Hills, Patterson was shot when he was only 11 years old. Needless to say, his fear of living day-to-day directed his lifestyle and impacted his ability to focus on his education. Mr. Patterson was already behind in school, having been identified as intellectually disabled. He was held back at least twice, and left school with just a sixth-grade education when he was nearly 14 years old. After being shot, he admittedly became angry. The world around him was relentless and depressing. His stepfather, a cocaine addict, sold drugs out of his apartment. He watched people overdose and "go crazy" from drugs and anger. He saw people shot and killed and beaten in front of him. School was no refuge for him. He soothed himself in the same way his family, friends, and neighbors did- with marijuana. He developed a pattern of use when he was only 12 years old. To this day, Mr. Patterson self-medicates with marijuana.

It is no wonder that by age 14, Mr. Patterson picked up his first juvenile adjudication for shoplifting. Unfortunately, he continued down the wrong path, alongside his friends from Happy Hills. He was in trouble for robbery and sent to a youth center. He started using harder drugs when he was in his teens, and by 2006 was

smoking crack cocaine. Since the age of 17, he has been in an out of prison, with at least five convictions for possessing controlled substances.

A large difficulty in Patterson's adult life was the instability caused by never having proper identification. Until just last year, Patterson had really only his birth certificate to his name. But with only his birth certificate—and with so much of his life spent in custody—he had no means of being able to prove his identity for the purpose of obtaining a social security card or state identification. When he tried to apply for a state ID, he was told he needed a social security card. When he tried to apply for a social security card, he was told he needed an ID.

Without a state identification card, Patterson lived life as a second-class citizen. He could not obtain steady housing, and instead relied on bouncing from home to home, and to places without supportive environments for sobriety. Without an ID, he could not obtain a job on the books and instead resorted to working odd jobs under the table in order to provide for himself. He relied on public transportation to get from place to place. This all remained true even while on supervised release for this offense, and even despite the best efforts of his federal probation officer to get him identification.

It is little surprise that Patterson would relapse back in February of 2023. That month, he was found present in a home where drugs were being used and sold, and Patterson himself was there to use. He was charged with simple possession of crack cocaine and sentenced to 18 months of probation.

Patterson is deeply ashamed of his relapse, but the silver lining is that it led him to where he is now. First, Patterson took his life into his own hands and has worked hard to avoid relapsing again. As part of his state probation, he is regularly tested for cocaine use. In the almost two years that have followed, Patterson has not relapsed once and has not tested positive for cocaine or other hard drugs once. He will complete probation this month after completing a substance abuse assessment scheduled for the 19th of March, a day after his scheduled sentencing.

Patterson also leaned into the goodwill of his supportive family members to provide more stable housing for him. He has strong relationships with his sister and niece, who have worked hand in hand with our office to help Patterson maintain on the right track. They ensure he has a place to live, even when his underemployment makes it difficult to make ends meet. He is loved and supported.

But there is more. Our office has worked diligently with Patterson and his family to help him solve a root issue—his lack of identification—with success. In October of 2024, after months and months of effort and coordination with the mitigation specialists and social workers at the Federal Community Defender, Patterson was able to obtain his state identification card. He was 54 years old at the time.



*Patterson, right, as he exited the Secretary of State with proper identification for the first time.*

Patterson has continued to do his best to stabilize his life under the circumstances. He got his first payroll job with the Center for Employment Opportunities, though brief. With the help of the Federal Community Defender's social work assistance, Patterson has applied for more than 50 jobs with companies that take in folks with criminal history, including Goodwill, Salvation Army, Home Depot, and Lowe's. Though his limitations make it difficult to find steady work, he is hopeful that he will be able to find meaningful long-term employment with continued effort and persistence. In the meanwhile, he will continue to work whatever jobs come his way and continue to live a sober drug-free life.

A prison sentence--let alone a 2-year sentence--will not be the cure to Patterson's woes. He will not be eligible to participate in RDAP or any meaningful drug

rehabilitation programming. Any sentence would only set him back further, retraumatizing him to a prison environment, destabilizing his housing and employment prospects, and reinforcing instability into his life. While his situation now is far from perfect, he is sober, he has family support, and he is in a much better position than he was in February of 2023, when he last relapsed. It is imperative to keep him on the right track.

Rather just reimpose the same period of supervised release, Patterson would benefit from a shortened period of supervised release, one that gives him a meaningful goal worth striving for. The current period of supervised release—in essence a lifetime period of supervision—provides him little emotional incentive to better his situation. With a five-year period of supervised release, Patterson will continue to have the structure and supervision needed to succeed, while giving him an end date—something he can be accomplished about completing. The proposed modification would give Patterson the transitionary stability he really needs.

### C. Conclusion

For the reasons stated, Patterson respectfully requests that this Court consider revoking supervised release, imposing a time served sentence, and reimposing supervised released with all his original conditions for not more than five years. Undersigned counsel conferred with Probation, who does not oppose such a resolution.

Respectfully submitted,

**FEDERAL COMMUNITY DEFENDER EASTERN DISTRICT OF MICHIGAN**

*s/ Daniel S. Dena*
Attorney for Defendant
FEDERAL COMMUNITY DEFENDER
613 Abbott Street, Suite 500
Detroit, Michigan 48226
T: 313-967-5834
E: Daniel_Dena@fd.org

Dated: March 12, 2025

### CERTIFICATE OF SERVICE

I hereby certify that on the above date, the foregoing document was filed with the clerk of the Court using the ECF system, which will send notification to all counsel of record.

s/ Brandy Flowers